**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | |
|---|---|
| Derrick Thomas,<br><br>    *On behalf of himself and those*<br>    *similarly situated,*<br><br>           Plaintiff,<br><br>    v.<br><br>Papa John's International, Inc.; It's Only<br>Downtown Pizza, Inc.; It's Only Pizza, Inc.;<br>It's Only Downtown Pizza II Inc.; It's Only<br>Papa's Pizza LLC; and Michael Hutmier,<br><br>           Defendants. | Case No. 1:17-CV-00411<br><br>Judge Michael R. Barrett |

**DEFENDANT PAPA JOHN'S INTERNATIONAL, INC.'S MEMORANDUM OF LAW
IN OPPOSITION TO PLAINTIFF'S MOTION TO CONDITIONALLY CERTIFY AN
FLSA COLLECTIVE ACTION AND TO AUTHORIZE NOTICE**

## PRELIMINARY STATEMENT

Plaintiff Derrick Thomas was employed as a delivery driver at a restaurant owned and operated by a Papa John's franchisee. He filed this lawsuit on behalf of himself and other delivery drivers employed by the same franchise group, alleging that their franchisee employers illegally applied the tip credit to delivery driver wages, under-reimbursed delivery drivers for their delivery expenses, and took illegal deductions from delivery drivers' wages. In addition to suing his actual franchise employers, Plaintiff has also brought this lawsuit against Papa John's International, Inc. ("PJI") – the franchisor of Papa John's branded restaurants – under a theory of joint-employer liability. Plaintiff now seeks to conditionally certify a collective action of delivery drivers who worked for all Defendants, including PJI.

The problem with Plaintiff's conditional certification theory is that it is premised on a joint-employer theory that has been rejected by every court to consider it. In particular, another federal district court has already examined PJI's franchise business and concluded that PJI does not dictate its franchisees' compensation policies. *See Durling v. Papa John's Int'l, Inc.*, No. 16 Civ. 3592 (S.D.N.Y. Mar. 1, 2018).[1] Plaintiff is therefore basing his claim against PJI on the fact that PJI, as the franchisor, requires franchisees to comply with a comprehensive set of standards that ensure a consistent customer experience at thousands of Papa John's locations across the country. Plaintiff's theory is that those standards are so comprehensive that they amount to PJI's full control over a franchisee's business, including its employment policies.

Every court that has considered this issue on the facts has come to the same conclusion: the economic reality of the franchise model is that a franchisor often imposes comprehensive and

---

[1] (*See* Declaration of Gerald L. Maatman, Jr. ("Maatman Decl."), ¶¶ 7-8, Exs. 4, 5 Transcripts of Proceedings, March 29, 2017 and March 1, 2018).

1

meticulous standards and guidelines to protect its brand, but in doing so, it does not usurp the authority that franchisees retain to hire and fire their own employees, set their compensation, set their schedules, and control their day-to-day activities. As a matter of contract and economic reality, that discretion remains with the franchisees, and the franchisor is not a joint-employer.

Plaintiff's claim can only succeed if he can show that PJI exercised control over his franchise employer's compensation and reimbursement policies. The court in *Durling* has already found that PJI does not possess or exercise this kind of control. And countless courts have found that such liability cannot be based on the standard contractual rights and obligations inherent to the franchise model. In order to succeed on his claim against PJI, therefore, Plaintiff must show that PJI employees were directing franchisee employment policies in a manner that is contrary to PJI policy. Plaintiff has presented no evidence of such acts. But even if he had, that evidence would be inherently individualized and specific. It would not establish that members of the putative collective action were subject to similar acts in a uniform manner by a multitude of franchisees and are therefore "similarly situated" with respect to their claims against PJI. Because Plaintiff has not identified any uniform policy that could subject PJI to joint-employer liability on behalf of the membership of the collective action as a whole, his motion for conditional certification should be denied.

## FACTUAL BACKGROUND

### A. The Parties

Defendant PJI and its affiliates own and operate a franchise business under the "Papa John's" brand. (Butler Decl.[2] ¶ 4.) Franchisees enter into a franchise agreement with PJI, which permits them to operate under the Papa John's brand, and thereby benefit from its name

---

[2] "Butler Decl." refers to the declaration of Richard Butler that is attached as Exhibit 2 to the Maatman Decl. filed contemporaneously herewith.

recognition and goodwill. (*Id.* ¶ 6.) There are approximately 731 individual Papa John's franchisees across the country. (*Id.* ¶ 5.) Collectively, they (and not PJI) – either directly or through affiliated entities – own and operate over 3,350 franchise stores in the United States.

Plaintiff Derrick Thomas avers that he worked as a delivery driver at the Papa John's Pizza located on Montgomery Road in Norwood, Ohio from February to May 2017, which is owned and operated by It's Only Downtown Pizza, Inc. (ECF 24-1, ¶ 3.) It's Only Downtown Pizza, Inc. is an independent franchise that entered into a franchise agreement with PJI on October 31, 2007. It's Only Downtown Pizza, Inc., along with two other named defendants that are also PJI franchisees, It's Only Pizza, Inc. and It's only Papa's Pizza LLC, are owned by defendant Michael Hutmier (and others). (Butler Decl. ¶ 27.) Together, those three franchise entities own and operate a total of nine Papa John's stores in the Cincinnati area. (*Id.* ¶ 28.) There are other Papa John's stores in the Cincinnati area, but they are not owned or operated by any of the Franchisee Defendants[3] named in this lawsuit.[4] (*Id.* ¶ 29.)

### B.    The Papa John's Franchise Agreement

The Papa John's chain of restaurants is characterized by a unique system comprised of "special recipes and menu items; distinctive design, decor, color scheme and furnishings; software and programs; standards, specifications and procedures for operations; systems for communicating with us, suppliers and customers; procedures for quality control; training assistance; and advertising and promotional programs (the 'System')." (Maatman Decl. Ex. 1,

---

[3] It's Only Downtown Pizza, Inc., It's Only Pizza, Inc., It's only Papa's Pizza LLC, It's Only Downtown Pizza II Inc., and Michael Hutmier are referred to herein as the "Franchisee Defendants."

[4] Plaintiff's motion states that "[t]he proposed FLSA collective class [sic] . . . consists of all delivery drivers who worked at any of the approximately twenty-seven Papa John's Pizza restaurants in the Cincinnati, Ohio area from June 16, 2014 to the present." (ECF 24 at 4.) However, his complaint limits his FLSA class [sic] and collective action allegations to the "Cincinnati Regional Stores" (*see* Compl. ¶¶ 209, 220), which is defined in the complaint as the Papa John's franchise locations owned and operated by the Franchisee Defendants (*see* Compl. ¶ 4.)

Franchise Agreement ("FA") at 1, Recitals B.) It is also characterized by the service marks, trade names, and trademarks, such as "Papa John's," "Papa John's Pizza," and the Papa John's logo (the "Marks"). (*Id.* at 1, Recitals C.)

Each franchisee enters into a franchise agreement that sets forth the respective rights and responsibilities of the parties. The franchise agreement gives franchisees "the non-exclusive right and franchise . . . to operate a retail restaurant under the System and Marks." (*Id.*, § 1.) In return, those franchisees must comply with the franchise agreement and operate their restaurants according to the detailed specifications required of Papa John's branded restaurants.

> [I]in order to ensure compliance with the quality standards and other requirements of the System, you must operate the Restaurant through strict adherence to the standards, specifications and policies of the System as they now exist, and as they may from time to time be modified. Such standards and policies include: (i) specifications and preparation methods for food and beverages; (ii) hours of operation; (iii) menu items and services offered; (iv) requirements and specifications for uniforms and/or attire of Restaurant personnel; (v) use of specified emblems and Marks on containers, bags, boxes, napkins, and other products; (vi) methods of payment accepted from customers; and (vii) data privacy and security.

(*Id.*, § 11(c); *see also* Butler Decl. ¶ 12.) PJI requires all franchisees to adhere to these System and brand standards in order to protect the goodwill and image of the entire chain and to maintain the high quality and consistency that is critical to attracting and retaining customers for all Papa John's branded restaurants, including franchise restaurants. (Butler Decl. ¶ 9.)

Franchisees remain the owners and operators of their own independent businesses in an arm's length contractual relationship with PJI. (Butler Decl. ¶ 10; *see also* Maatman Decl. Ex. 1, FA, § 21(a); Hutmier[5] Decl. ¶ 7.) In particular, the franchise agreement recognizes that

---

[5] "Hutmier Decl." refers to the Declaration of Michael Hutmier offered in support of Franchisee Defendants' Opposition to Plaintiff's Motion to Conditionally Certify an FLSA Collection Action and to Authorize Notice.

franchisees are and shall remain in sole and complete control of the employment and

compensation policies that prevail in each of their stores:

> You acknowledge that: (i) we will have no responsibility for the day-to-day
> operations of the Restaurant or the management of your business, including
> ensuring the safety and security of your customers or employees; (ii) you
> independently control the operation of your business and the results of your
> operations will depend substantially on your business acumen and promotional
> and managerial efforts; and (iii) *we have no responsibility for or control or
> supervision of your employees or your employment practices.*

(Maatman Decl. Ex. 1, FA, § 21(b) (emphasis added); *see also id.*, § 11(c) ("You have full

responsibility for the conduct and terms of employment for your employees and the day-to-day

operation of your business, including hiring, termination, pay practices and any other

employment practices."); Hutmier Decl. ¶¶ 9-10.)

   **C.      The Papa John's System And Brand Standards**

   The success of the Papa John's chain of restaurants depends on the uniformity and high

quality of the food, customer service, design, and other elements of a Papa John's customer

experience across thousands of locations across the country. (Butler Decl. ¶ 11.) The System and

brand standards – which relate primarily to food preparation, store cleanliness and appearance,

and employee dress – are the means by which Papa John's ensures uniformity and quality across

locations, which in turn preserves and enhances the value of the Papa John's brand. (*Id.*, ¶ 12.)

The methods by which PJI implements and maintains those standards throughout the entire Papa

John's chain are common in the franchise industry, especially "business format" fast casual

franchise restaurants like Papa John's. They include the following:

   Establishing Brand Standards To Ensure A Consistent Customer Experience – PJI has the

exclusive right to establish the menu items that are served at all Papa John's restaurants,

including the recipes used, food packaging, and sometimes the food suppliers and other vendors.

(Maatman Decl. Ex. 1, FA, § 12(a), (e).) PJI also requires franchisees to adhere to strict

requirements concerning the design, décor, and signage of Papa John's restaurants, as well as employee uniforms and other elements that comprise the look and feel of a Papa John's restaurant. (*Id.*, § 4(a), (b), 10(a), (b), (d).) One of the ways that PJI ensures that franchisees adhere to these brand standards is through the provision of manuals and other documents that contain "(i) the mandatory and suggested specifications, standards and operating procedures prescribed from time to time by us; and (ii) information relative to other obligations hereunder and the operation of the Restaurant." (*Id.*, § 11(e).) Franchisees have responsibility for setting their own prices, except with respect to mandatory maximum price points for national promotions. (*Id.* § 12(f); Hutmier Decl. ¶¶ 9-10.) In order to ensure a consistent customer experience with respect to pizza delivery, the franchise agreement prohibits franchisees from charging or collecting a delivery charge or separate delivery fee. (*Id.*; *see also* Butler Decl. ¶ 13.)

Inspections – The franchise agreement gives PJI the right to inspect franchise restaurants "to ensure compliance with all required standards, sspecifications and procedures of the System, this Agreement and the Manuals." (Maatman Decl. Ex. 1, FA, § 11(j).) PJI may also "make suggestions and give mandatory instructions with respect to your operation of the Restaurant, as we consider necessary or appropriate to ensure compliance with the then-current quality standards and other requirements of the System and to protect the goodwill and image of the Chain." (*Id.*) PJI also has the right to inspect a franchisee's books and records to ensure that franchisees are complying with their obligation to pay royalties to PJI. (*Id.* § 13(e).)

PJI assigns each Papa John's franchise restaurant a Franchise Business Director ("FBD") to inspect the store and ensure that the franchise owner/operator is complying with Papa John's brand standards. (Butler Decl. ¶ 14.) Two FBDs were assigned to the nine stores owned and operated by the Franchisee Defendants during the relevant time period (June 16, 2014 to the

6

present).[6] (*Id.* ¶ 15.) The FBD inspects each of their assigned franchise stores approximately once per year. (*Id.* ¶ 16.) While franchise employees are present when FBDs perform these inspections, FBDs have no power to hire, fire, or discipline those employees. (*Id.* ¶ 17; Hutmier Decl. ¶ 9.) Nor do FBDs audit or inspect franchisees' payroll data or practices. (*Id.* ¶18.)

<u>Training</u> – PJI requires franchisees to conduct training of their own employees using materials provided by PJI: "You must, at your own expense, conduct such training and instruction, using such materials, equipment and supplies, as we reasonably require from time to time." (FA § 11(d).) The training that PJI requires franchisees to provide to delivery drivers is intended to ensure that delivery drivers deliver prompt, courteous customer service in a manner that is consistent with Papa John's System and brand standards. (Butler Decl. ¶ 20.) PJI also requires all franchisees to participate in an extensive training program before they are allowed to own and operate a Papa John's franchise restaurant. (*Id.* ¶ 21.) During that training, prospective franchisees are educated on all aspects of System and brand standards. (*Id.* ¶ 22.) The purpose of the training program is to better acquaint franchisees with the proper operation of a Papa John's restaurant; it is not to tell franchisees how to compensate their employees. (*Id.*)

<u>Standardized Computer Systems And Centralized Website</u> – PJI requires franchisees to acquire and maintain a set of computer systems, hardware, software, network devices, security systems, and internet access platforms. (Maatman Decl. Ex. 1, FA, ¶ 10(c), 10(c)(i)(B).) It also maintains a centralized public-facing Papa John's website that customers can use to access information about the Papa John's chain, place orders with their local Papa John's restaurant (whether franchise owned or owned by a subsidiary of PJI), and even browse for career

---

[6] Those FBD's are Robert Richwine from December 25, 2005 to January 1, 2018 and Rebecca Durica from January 1, 2018 to the present. Bob Olberding is the Operations Specialist for the nine stores and has been in that position since February 9, 1998. (*Id.* ¶ 15.)

7

opportunities with PJI or a franchise restaurant. (Butler Decl. ¶ 24.) Requiring franchisees to use a standard package of computer systems ensures a consistent and high quality customer experience by, among other things, coordinating and routing customer orders through the website to ensure efficient, on time delivery. (*Id.* ¶ 25.) It also allows PJI to more effectively exercise the audit and inspection rights provided for in the franchise agreement. (*Id.* ¶ 25.)

### D.     Plaintiff's Complaint

Plaintiff alleges that he was jointly employed by all Defendants, including PJI, and that all defendants are a "single integrated enterprise." (Compl. ¶¶ 20, 22.) Under a separate section of the Complaint labeled, "Joint Employer Allegations," Plaintiff alleges that "PJI exercises substantial control over Plaintiff and similarly situated delivery drivers, both directly and indirectly." (*Id.* ¶ 130.) However, the control that Plaintiff alleges is nothing other than the System and brand standards that PJI uses to ensure a consistent and high quality customer experience across the Papa John's chain, and the methods that PJI uses to enforce those standards: "PJI devotes significant resources to providing franchisees with assistance in restaurant operations, training, marketing, site selection and restaurant design, and requires their franchisees to closely adhere to PJI's operating standards and procedures." (*Id.* ¶ 139.)

In purported support of his joint-employer theory, Plaintiff makes a series of allegations relating to PJI's "control" of its franchisees. In particular:

- <u>Detailed Brand And System Standards</u>.  Plaintiff alleges that PJI strictly controls menu items, uniforms, and the design and décor of Papa John's restaurants: "PJI provides franchisees with operating manuals ("Manuals") that contain the mandatory and suggested specifications, standards and operating procedures prescribed by PJI." (*Id.* ¶ 148; *see also* ¶¶ 147, 149, 150, 151, 152, 168, 173, 174, 189, 190, 191.) He also alleges that "PJI's franchisees must get approval from PJI for restaurant design and location," and that PJI "provides layout and design services for subcontractors, signage installers and telephone systems. Franchisees may purchase complete new store equipment packages but only through an approved third-party supplier." (*Id.* ¶ 143; *see also* ¶¶ 144, 145, 175.) He further alleges that "Plaintiff and similarly situated delivery drivers were required to affix Papa John's signs to their vehicles, to wear uniforms prominently

8

featuring the Papa John's logo and use delivery bags featuring the Papa John's logo." (*Id.* ¶ 199; *see also* ¶ 200.)

- <u>Inspection Rights</u>. Plaintiff alleges that "PJI periodically inspects and evaluates each franchisee's operations at such times and in such manner as PJI reasonably determines" (*id.* ¶ 153; *see also* ¶¶ 154, 155, 164, 176, 177, 178, 196), and "PJI requires franchisees to adhere to strict accounting and recordkeeping standards, and requires franchisees to make their financial information available to PJI upon request" (*id.* ¶ 195).

- <u>Training</u>. Plaintiff also points to the training that PJI requires franchisees to undergo: "[w]hen a franchisee opens a new restaurant, PJI corporate employees come to the restaurant to assist with the opening, and focuses on on-site training of team members, and training management on staffing." (*Id.* ¶ 146; *see also* ¶¶ 156, 157, 158, 159, 160, 161, 162, 163, 165.) He further alleges that "Plaintiff and similarly situated delivery drivers were required to watch training videos provided by PJI." (*Id.* ¶ 201.)

- <u>Standardized Computer Systems And Centralized Website</u>. Plaintiff alleges that the computer systems franchisees are required to operate, and the centralized Papa John's website and its national advertising initiatives are further indicia of the control that PJI exercises over franchise employees: "Franchisees' 'net sales' are determined not by the franchisee but by PJI, through PJI's Information System, which franchisees are required to use." (*Id.* ¶ 142; *see also* ¶¶ 174, 179, 180, 181, 182, 183, 184, 185.) "In 2016, 56% of orders to Papa John's domestic restaurants were made online, compared to just 25% of orders in 2009. This impacts franchisees because a higher portion of their profits go directly to PJI when orders are made online …. It also affects employees in the franchise stores, as they spend less time taking orders by phone and more time completing other tasks in the store or on the road making deliveries." (*Id.* ¶ 188; *see also* ¶¶ 169, 170, 171, 172, 186, 187.) "Papa John's franchise stores are required to join advertising cooperatives where they contribute a percentage of their sales for PJI-approved marketing campaigns." (*Id.* ¶ 192; *see also* ¶¶ 193, 194.)

## **ARGUMENT**

## I. **PLAINTIFF BEARS THE BURDEN OF DEMONSTRATING THAT MEMBERS OF THE PUTATIVE COLLECTIVE ACTION ARE SIMILARLY SITUATED WITH RESPECT TO THEIR CLAIM AGAINST PJI**

The FLSA enables an employee to bring a lawsuit against an employer on behalf of himself and any other "similarly situated" individuals. 29 U.S.C. § 216(b); *see also Comer v. Wal-Mart Stores, Inc.*, 454 F.3d 544, 546 (6th Cir. 2006). The Sixth Circuit has held that "plaintiffs are similarly situated when they suffer from a single, FLSA-violating policy, and when proof of that policy or of conduct in conformity with that policy proves a violation as to all

the plaintiffs." *O'Brien v. Ed Donnelly Enter., Inc.*, 575 F.3d 567, 585 (6th Cir. 2009), *abrogated on other grounds by Campbell-Ewald Co. v. Gomez,* 136 S. Ct. 663 (2016).

Plaintiff's claim centers around the theory that Defendants – meaning their actual franchise employers *and* PJI – operated as a single, integrated unit to violate the FLSA. At the heart of this claim is Plaintiff's contention that PJI can be held liable under a joint-employer theory. Courts have rejected such attempts to use the conditional certification device to create large, complex "joint employer" cases where the evidence does not support a finding that the purported joint employer imposed an unlawful policy on the members of the proposed collective. *See Gonzalez v. HCA, Inc.*, No. 3:10-00577, 2011 WL 3793651, at *13-14 (M.D. Tenn. Aug. 25, 2011) (denying motion for conditional class certification when plaintiffs failed to show how the parent corporation could be deemed their joint employer).

For example, in *Korenblum v. Citigroup, Inc.*, 195 F. Supp. 3d 475 (S.D.N.Y. 2016), plaintiffs sought to represent more than 7,500 individuals who were employed by 40 different employers. The only thing that these individuals had in common was the fact that their employers contracted with defendant Citigroup to provide IT services. *Id.* at 478-79. The court in *Korenblum* rejected plaintiffs' motion for conditional certification because they failed to show that Citigroup imposed or controlled the policy that they were challenging and they failed to present evidence to substantiate their claims that Citigroup was liable as a "joint employer." *Id.* at 487; *see also  Martin v. Sprint/united Mgmt. Co.*, No. 15 Civ. 5237 (PAE), 2016 WL 30334, at *8 (S.D.N.Y. Jan. 4, 2016) ("Courts have been especially hesitant to grant conditional certification of a vast class where structural considerations – such as a company's stratified or decentralized structure or the presence of intermediary entities between the company and the

members of the putative collective – cast doubt on the claim that uniform company policies governed workers across a sprawling geographic area.").

Accordingly, in order to obtain conditional certification, it is Plaintiff's burden to show that other delivery drivers are similarly situated with respect to the alleged FLSA violations and with respect to their joint-employer theory. To meet this burden, Plaintiff must "submit evidence establishing at least a colorable basis for his claim that a class of 'similarly situated' plaintiffs exists." *O'Neal v. Emery Fed. Credit Union*, No. 1:13-CV-22, 2013 WL 4013167, at *5 (S.D. Ohio Aug. 6, 2013). This means something more than bare allegations: "[C]onditional certification should not be granted unless the plaintiff presents some evidence to support his allegations that others are similarly situated." *Harrison v. McDonald's Corp.*, 411 F. Supp. 2d 862, 868 (S.D. Ohio 2005).

Plaintiff's motion for conditional certification should be denied because, among other reasons, he has offered no evidence to establish that members of the putative collective action are similarly situated with respect to any viable claim of joint-employer liability against PJI.

## II. PLAINTIFF HAS NOT MET HIS BURDEN TO SHOW THAT HE AND ALL OTHER PUTATIVE COLLECTIVE ACTION MEMBERS ARE SIMILARLY SITUATED WITH RESPECT TO THEIR JOINT-EMPLOYER ALLEGATIONS

### A. Courts Have Consistently Held That The Standards That Franchisors Use To Protect Their Brand Do Not Give Rise To Joint-Employer Liability

Courts have consistently held that a franchisor must be permitted to establish a framework to protect its brand and intellectual property without subjecting itself to liability for employment matters at independently owned and operated franchisees. Countless decisions have recognized and upheld the legitimacy of this central aspect of the franchise model: *i.e.,* franchisees purchase from PJI a license to operate an independent business that makes use of the intellectual property and goodwill associated with the established, nationally recognized Papa

11

John's brand. In order to protect that goodwill and intellectual property, franchisees agree to adhere to a detailed set of System and brand standards set by PJI and they agree to allow PJI to inspect their franchise locations to monitor compliance with those standards. In a "business format" franchise model – like the one used by PJI – the brand standards encompass all aspects of a business plan, including marketing, operations, production, and administration.[7] Franchisees, however, retain the exclusive right to operate their businesses, including retaining full control over their own employment matters.

For example, in *In Re Jimmy John's Overtime Litigation*, No. 14-CV-5509, 2018 WL 3231273 (N.D. Ill. June 14, 2018), the court rejected franchisee employees' attempt to use a franchisor's brand standards and business model to establish joint employment liability:

- Detailed Brand and System Standards: There, as here, plaintiffs alleged that the franchisor controlled virtually all aspects of franchise stores' appearance and operation through the use of detailed operations manuals and system standards. The court held: "Jimmy John's' control over the systems, operations, and dress code at franchise stores, as pervasive as it may seem, *does not amount to joint employment*." *Id.* at \*20 (emphasis added).[8]

---

[7] The rights and responsibilities common in a "business format" franchise model were explained by the California Supreme Court in *Patterson v. Domino's Pizza, LLC*, 333 P.3d 723, 733-43 (Cal. 2014):

> Under the business format model, the franchisee pays royalties and fees for the right to sell products or services under the franchisor's name and trademark. In the process, the franchisee also acquires a business plan, which the franchisor has crafted for all of its stores. This business plan requires the franchisee to follow a system of standards and procedures. A long list of marketing, production, operational, and administrative areas is typically involved. The franchisor's system can take the form of printed manuals, training programs, advertising services, and managerial support, among other things . . . The goal–which benefits both parties to the contract–is to build and keep customer trust by ensuring consistency and uniformity in the quality of goods and services, the dress of franchise employees, and the design of the stores themselves . . . In the typical arrangement, the franchisee decides who will work as his employees, and controls day-to-day operations in his store. The franchise arrangement puts the franchisee in a better position than other small businesses. It gives him access to resources he otherwise would not have, including the uniform operating system itself.

[8] *See also Evans v. McDonald's Corp.*, 936 F.2d 1087, 1089-90 (10th Cir. 1991) (holding that no joint-employer relationship existed even though "McDonald's may have stringently controlled the manner of its franchisee's operations, conducted frequent inspections, and provided training for franchise employees); *Schlotzsky's, Inc. v. Hyde*, 538 S.E.2d 561, 562-563 (Ga. Ct. App. 2000) ("Although the [Schlotzsky's] operations manual sets out mandatory standards for food and service quality, some of which are quite specific and detailed, these standards are not intended as a means of directing or controlling 'the time, manner and method of performance of the daily operations of the franchise but as a means of achieving a certain level of quality and uniformity within the

- <u>Inspection rights</u>: There, as here, plaintiffs alleged that the franchisor's right to send PJI employees into franchise stores to inspect their operation and compliance with brand standards put PJI in direct control of franchise employees. But the court in *Jimmy John's* held "The Business Coach's job was to audit the store and its employees for compliance with Jimmy John's Brand Standards, including employee dress code. He fulfilled his duties by reducing the store's points in that category. *Doling out a low audit score does not amount to discipline.*" *Id.* at *16 (emphasis added).[9]

- <u>Training</u>: There, as here, plaintiffs alleged that the franchisor controlled franchisees' employment matters through mandated training programs. But the court held: "In our view, even accepting Plaintiffs' characterization that Jimmy John's required franchisees to follow its training methods, that does not speak to joint employment. Certainly, training employees to perform tasks the "Jimmy John's way" constitutes some control over the way the store is managed. But that alone does not rise to the level of joint employment, and *no reasonable juror would decide that a franchisor that sets up training programs for its franchisees' employees is in control of those employees in a meaningful way for joint employment purposes.*" *Id.* at *19 (emphasis added).[10]

Even though the franchise business at issue in that case exhibited all of the elements common to the business format franchise model – which are the same elements Plaintiff points to as indicia of control in this case – the court in *Jimmy John's* concluded that the franchisor at issue "does

---

[Schlotzsky's] system.'); *Folsom v. Burger King*, 958 P.2d 301, 309 (Wash. 1998) (rejecting negligence liability on the part of the franchisor where "Burger King's authority over the franchise was limited to enforcing and maintaining the uniformity of the Burger King system").

[9] *See also Evans*, 936 F.2d at 1090 (holding that McDonald's was not employer of franchise employee even though it "provided training for franchise employees" and "conducted frequent inspections" of franchisee locations); *Russom v. Sears, Roebuck & Co.*, 558 F.2d 439, 443 (8th Cir. 1977) (holding Sears was not employer of employees of contractor providing in-home service of Sears products even though Sears provided training for those employees); *Vann v. Massage Envy Franchising LLC*, No. 13-CV-2221, 2015 WL 74139, at *7 (S.D. Cal. Jan. 6, 2015) (finding that even though "[franchisor] did actively visit [franchisee], such activity does not rise to the level of exercising control over day-to-day operations"); *Patterson*, 733 P.3d at 730, 742-43 (finding no franchisor liability where an area leader and other inspectors visited the franchisee four times per year.); *Kerl v. Dennis Rasmussen, Inc.*, 273 Wis. 2d 106, 131–32 (2004) (holding that "a right of inspection do not establish a franchisor's control or right to control the daily operations of the franchisee sufficient to give rise to vicarious liability for all purposes or as a general matter"); *Cislaw v. Southland Corp.*, 6 Cal. Rptr. 2d 386, 392 (Cal. Ct. App. 1992) (holding that franchisee was not agent of franchisor even where franchise "agreement obligate[d] the . . .store owners/franchisees to complete an operations training program").

[10] *See also Baetzel v. Home Instead Senior Care*, 370 F. Supp. 2d 631, 640 (N.D. Ohio 2005) ("Courts have routinely found . . . evidence of standardization [including franchisee owner training] insufficient to satisfy the showing of interrelated operations and control over labor relations required by the single employer test.") (citations omitted); *Catalano v. GWD Mgmt. Corp.*, No. 03-CV-167, 2005 WL 5519861, at *11 (S.D. Ga. Mar. 30, 2005), *aff'd sub nom., Catalano v. McDonald's Corp.*, 199 F. App'x. 803 (11th Cir. 2006) ("A franchisor's reserving the right to inspect, monitor, or evaluate the franchisee's compliance with its standards and to terminate the franchise for noncompliance is not the equivalent of retaining day-to-day supervisory control of the franchisee's business operations as a matter of law.") (internal quotation marks and citation omitted).

not: (1) have the power to hire or fire franchise employees; (2) supervise and/or control employee work schedules or conditions of payments; (3) determine the rate and method of payment; or (4) maintain employment records for franchise employees." *Id.* at *23.[11]

Similarly, a franchisor's requirement that franchisees maintain and use a particular computer system (here, a point-of-sale system called FOCUS) does not amount to a level of control that gives rise to joint-employer status. For instance, in *In Re Domino's Pizza Inc.,* No. 16 Civ. 2492 (AJN)(KNF), 2018 WL 4757944, at *7 (S.D.N.Y. Sept. 30, 2018), the Court held that Domino's PULSE system, which is a point-of-sale system that "records and tracks all revenue and expenses" is "'only an extension' of quality control procedures." Likewise, in *Durling*, the court held that the franchisees' use of PJI's proprietary POS system "in no way indicated that PJI dictated a nationwide delivery driver payment policy." *See* Maatman Decl. ¶ 7, Ex. 4, Transcript of Proceedings, March 29, 2017 at 24:22-25; 25:1-5.)

### B. Plaintiff Has Failed To Establish That PJI Exercised Any Direct Control Over His Franchise Employer's Compensation Or Reimbursement Policies

Plaintiff's entire similarly situated theory is premised on a failed joint-employer theory. As the above cases demonstrate, Plaintiff's motion cannot be granted solely on the basis of the methods that PJI uses to maintain and enforce its System and brand standards because those methods do not give rise to joint-employer liability. For his claim against PJI to survive, therefore, Plaintiff must establish that PJI exercised inordinate control over how his franchisee employer(s): (1) applied the tip credit to delivery driver wages; (2) reimbursed delivery drivers

---

[11] *See also In Re Domino's Pizza Inc.*, 2018 WL 4757944, at *10 (finding "the Domino's Defendants exercised neither formal nor functional control over Plaintiffs, and therefore do not qualify as Plaintiffs' employers"); *Jacobson v. Comcast Corp.*, 740 F. Supp. 2d 683, 690 n. 6 (D. Md. 2010) (noting courts "have routinely concluded that a franchisor's expansive control over a franchisee does not create a joint employment relationship"); *Chen v. Domino's Pizza, Inc.*, No. 09-CV-107, 2009 WL 3379946, at *3 (D.N.J. Oct. 16, 2009) ("Courts have consistently held that the franchisor/franchisee relationship does not create an employment relationship between a franchisor and a franchisee's employees.").

14

for their delivery expenses; and (3) took deductions from delivery drivers' wages. (*see* Compl. ¶ 6) Further, to satisfy his burden at the conditional certification stage, he must establish that PJI did so in a similar way across the entire membership of the putative collective action.

Plaintiff has presented no evidence that this is the case. To be sure, Plaintiff's complaint makes the conclusory allegation that "PJI has the power to curtail the unlawful policies, patterns and/or practices" alleged in the complaint.[12] (Compl. ¶ 131); *see also Arrington v. Michigan Bell Tel. Co.*, No. 10-10975, 2011 WL 3319691, at *6 (E.D. Mich. Aug. 1, 2011) ("conclusory allegations are insufficient to support conditional certification"). But this is contrary to: (1) the express terms of the franchise agreement, which gives franchisees exclusive control over their own employment policies (Maatman Decl. Ex. 1, FA, §§ 21(b), 11(c)); and (2) the conclusions of another court, which held – on substantial evidence – that PJI does not dictate the compensation or reimbursement policies for delivery drivers at franchise stores.

On May 13, 2016, a different group of plaintiffs filed suit against PJI in the U. S. District Court for the Southern District of New York on behalf of delivery drivers. In their Amended Class/Collective Action Complaint, these plaintiffs seek to "redress [PJI's] systematic policy and practice of paying its delivery drivers hourly wages that are well below the minimum wage." (Maatman Decl. Ex. 3, *Durling* Amended Class/Collective Action Complaint ¶ 1.) Like Plaintiff Thomas in this action, all but one of those plaintiffs worked at franchise stores, so their claims against PJI were based on a joint-employer theory.[13] After their first motion was denied without

---

[12] Plaintiff alleges that PJI has a financial incentive to promote the alleged FLSA violations because they minimize labor costs and therefore increase profitability of franchise stores. "PJI has a clear and direct interest in franchise stores minimizing labor costs to increase profitability – even if it means minimizing labor costs below state and federal minimums – particularly if they are permitted to collect profits while also being insulated from legal liability." (Compl. ¶ 132.) "PJI acknowledges that labor costs and labor-related benefits are primary components in the cost of operation of Papa John's restaurants." (*Id.* ¶ 167). This is factually wrong. Royalties are based on net sales, which are not impacted by a franchisees' labor costs or profitability. (Maatman Decl. Ex. 1, FA, § 3(a)(ii).)

[13] Specifically, the plaintiffs in *Durling* alleged that PJI's "policies and practices . . . cause drivers at both corporate and franchise stores to be uniformly under reimbursed" (*id.* ¶ 3), including its "standardized procedures for hiring

prejudice,[14] the plaintiffs in *Durling* filed a renewed motion for conditional certification, which relied on extensive evidence adduced during discovery. *Durling*, No. 16 Civ. 03592 (S.D.N.Y.) (ECF Nos. 160, 161, 208.) The Court in *Durling* held – for the second time – that the plaintiffs had failed to establish that PJI dictated delivery driver compensation or reimbursement policies at franchise stores and denied conditional certification on that basis: "Plaintiffs have not adduced any evidence that the Defendant directed or was otherwise involved in setting rates for per-delivery reimbursements at franchisee-owned stores and thus their evidence is conspicuously silent as to how Defendant was involved in or responsible for the policy alleged to have violated the law." (*See* Maatman Decl. ¶ 8, Ex. 5, Transcript of Proceedings, March 1, 2018 at 14.) Plaintiff has presented no evidence to contradict the finding in *Durling*.

Without any common policy to rely on, Plaintiff in this case is left to argue that individual PJI employees – acting contrary to PJI policy and beyond the scope of PJI's rights under the franchise agreement – somehow directed his franchise employer's compensation and reimbursement policies. But Plaintiff has produced no evidence that any FBD or other PJI employee engaged in such activities. His declaration deals exclusively with the working conditions at the franchise store where he worked and the compensation policies that were set by his franchise employer. (ECF No. 24-1.) The only statement that even arguably relates to PJI is

---

delivery drivers" (*id*. ¶ 23); "standard policies, systems, procedures and requirements" for delivery drivers "promulgated" by PJI (*id*. ¶ 25); and "the policy by which delivery drivers are underreimbursed." (*Id*. ¶ 26.) According to the *Durling* plaintiffs, PJI "reap[s] profits from Papa John's stores by under-reimbursing delivery drivers, while, at the same time, attempting to shield itself from liability from wage and hour lawsuits brought by those drivers" through a "policy and practice of selling certain of its stores to local owners as a franchise." (*Id*. ¶ 19.) In doing so, plaintiffs allege that PJI received "fees and royalties that are directly tied to the profits its franchises make, so the less its franchisees pay to their delivery drivers, the more money [PJI] makes." (*Id*. ¶ 20.)

[14] On October 14, 2016, the plaintiffs in *Durling* sought conditional certification of an FLSA collective consisting of all delivery drivers who work, or have worked, at both corporate and franchisee Papa John's stores. *Durling*, No. 16 Civ. 3592 (S.D.N.Y.) (ECF Nos. 66, 67.) On March 29, 2017, the court denied that motion without prejudice. (*See* Maatman Decl., ¶ 7, Ex. 4, Transcript of Proceedings, March 29, 2017 at 24:12-15.) The court held that "plaintiffs have offered no evidence that [PJI] dictated the payment policy for delivery drivers at all Papa John's restaurants, including franchises." (*Id*. at 24:12-15.)

Plaintiff's unsupported assertion that the (franchise) managers "regularly clocked me and other delivery drivers out early on a delivery run so that they could save time on their Customer Service Store, a metric used by Papa John's to evaluate store performance." (*Id.* ¶ 21.) This speculation about others' states of mind should be stricken or disregarded because it lacks any foundation in personal knowledge. But even if taken at face value, it relates only to independent decisions made by franchisee employees, not to anything that PJI directed them to do.

Finally, and most critically, even if Plaintiff had presented some evidence that an FBD or other PJI employee had impermissibly interfered in his franchise employer's employment policies, that evidence could not sustain Plaintiff's burden at this stage. Such unauthorized acts – even if they did occur – would be beyond the terms of the franchise agreement, outside the scope of PJI's franchise model, and contrary to any PJI policy. By their nature, such acts would be individualized and specific. Unless Plaintiff could establish that similar unauthorized activity was impacting other delivery drivers' compensation and reimbursement in the same way, such evidence would not and could not establish that all members of the putative collective action are similarly situated with respect to their joint-employment claims against PJI.

## III.     The Court Should Not Adopt Plaintiffs' Proposed Form And Method Of Notice[15]

### A.     Plaintiffs' Proposed Form Of Notice Is Misleading

If this Court grants Plaintiff's Motion, it should still reject his proposed form and method of notice. First, the proposed notice is misleading in that it never mentions that the claims against PJI depend on a finding of joint-employer liability. Instead, it misleadingly uses the term "Papa John's" without defining it or explaining the relationship between PJI and putative opt-ins

---

[15] If the Court grants conditional certification, PJI respectfully requests that the parties be given a period of two weeks from the date of the order to meet and confer regarding the terms of the notice and the notice process. *See, e.g.*, *Mark v. Gawker Media LLC*, No. 13 Civ. 4347 (AJN), 2014 U.S. Dist. LEXIS 114011, at *23 (S.D.N.Y. Aug. 15, 2014).

50197940v.5

franchisee employers. (*Id*.) The notice does not adequately warn franchise employees that the theory of the case they are joining involves numerous, complicated issues of joint-employer liability that will add layers of complexity and delay to every stage of this case, which will impact the timely and efficient resolution of their claims.[16]

Second, the recipients of the proposed notice do not mirror the definition of the proposed collective. Plaintiff defines the collective as:

> All non-owner, non-employer delivery drivers who worked for Defendants at any of the "It's Only" Papa John's restaurants in the Cincinnati, Ohio area from June 16, 2014 to present.

(ECF No. 24 at 1.) In contrast, Plaintiff's notice is addressed to:

> All current and former delivery drivers who work or worked at Papa John's Pizza in the Cincinnati at any time from June 16, 2014 to present.

(ECF No. 24, Ex. 6.) As explained above, the Franchisee Defendants own and operate only nine Papa John's stores in the Cincinnati area. The other Cincinnati stores are owned and operated by different franchisees. Plaintiff's notice is therefore broader than the proposed collective.

Third, Plaintiff's notice fails to adequately inform putative opt-ins of the potential consequences of joining the lawsuit, including potential discovery and trial obligations. *See, e.g., Snide v. Disc. Drug Mart, Inc.*, No. 1:11-CV-0244, 2011 WL 5434016, at *7 (N.D. Ohio Oct. 7, 2011), *report and recommendation adopted*, No. 1:11-CV-00244, 2011 WL 5452153 (N.D. Ohio Nov. 8, 2011) (holding that plaintiff's Notice must include language describing possible discovery requirements of opt-in plaintiffs). The notice form should adequately describe opt-ins' potential discovery obligations and the fact that they may be required to travel to the Southern

---

[16] Plaintiff's proposed text notice language suffers from the same problem insofar as it does not adequately inform delivery driver of their rights and misleadingly refers to "Papa John's" making no distinction between a franchisee or PJI corporate (ECF No. 24 at 16) ("You are receiving this notice because records show that you worked as a delivery driver for *Papa John's* . . . .") (emphasis added)

District of Ohio to be deposed and/or participate in a trial. *See, e.g.*, *Baden-Winterwood v. Life Time Fitness*, No. 2:06-CV-99, 2006 WL 2225825, at *2 (S.D. Ohio Aug. 2, 2006) (approving proposed notice language, stating: "If you elect to join this lawsuit, you may also be required to provide information, give a deposition, and/or testify in court").

### B. Plaintiff's Proposed Method Of Notice Is Excessive And Prejudicial

Plaintiff is asking this Court to approve an opt-in period that extends for 90 days. (ECF No. 24 at 14.) That is excessive and far beyond what courts typically allow in this District. As this and other Courts have recognized, an opt-in period of 45 to 60 days is sufficient barring extraordinary circumstances – not present here – that would warrant a longer notice period. *See, e.g., Watson v. Advanced Distribution Servs.*, *LLC,* 298 F.R.D. 558, 565 (M.D. Tenn. 2014) (denying Plaintiffs' request for 90 days and setting opt-in period of 45 days); *Heaps v. Safelite Sols., LLC*, No. 2:10-CV-729, 2011 WL 1325207, at *9 (S.D. Ohio Apr. 5, 2011) (limiting opt-in period to forty-five days, when Plaintiffs proposed 90, finding that the shorter period "satisfies the need to prevent delay in this litigation while also allowing potential plaintiffs time to fully consider their options"); *Baden-Winterwood*, No. 2:06-CV-99, 2006 WL 2225825, at *9 ("[S]ixty (60) days is too long and would needlessly delay the litigation.").

Plaintiff is also seeking to send out notice in nearly every manner imaginable – by mail, email, posting at store locations, and text message. Sending multiple forms of notice, as Plaintiff proposes, would be inappropriate and "potentially could be interpreted as encouragement by the court to join the lawsuit." *Wlotkowski v. Mich. Bell Tel. Co.*, 267 F.R.D. 213, 220 (E.D. Mich. 2010); *see also, Lutz v. Huntington Bancshares Inc.*, No. 2:12-CV-01091, 2013 WL 1703361, at *7 (S.D. Ohio Apr. 19, 2013); *Wolfram v. PHH Corp.*, No. 1:12-CV-599, 2012 WL 6676778, at *4 (S.D. Ohio Dec. 21, 2012); *Knispel v. Chrysler Grp. LLC*, No. 11-11886, 2012 WL 553722, at *8 (E.D. Mich. Feb. 21, 2012).

19

Plaintiff offers no support for his assertion that multiple forms of notice, in particular notice by text message, is justified. Instead, Plaintiff argues that text message notice is appropriate because he simply assumes that Defendants "likely" communicate with deliver drivers by calling their cell phones. (ECF No. 24 at 16.) This Court should reject Plaintiff's request to bombard putative opt-ins with notice from every direction because it will have the prejudicial effect of encouraging employees to join the lawsuit. "The purpose of notice is simply to inform potential class members of their rights. Once they receive that information, it is their responsibility to act as they see fit." *See, e.g.*, *Wlotkowski*, 267 F.R.D. at 220. Thus, "[c]ourts generally approve only a single method for notification unless there is a reason to believe that method is ineffective." *Wolfram*, 2012 WL 6676778, at *4.

Finally, this Court should also reject Plaintiff's request that the Court order Defendants to produce a computer-readable list of the names, last known addresses, telephone numbers, e-mail addresses, dates of employment, and job titles for all persons employed at the "It's Only" Papa John's Pizza restaurants as delivery drivers between June 16, 2014 and the present. (ECF No. 24 at 17.) Here, again, Plaintiff is refusing to acknowledge the reality of the contractual nature of the relationship between PJI and its franchisees. The information Plaintiff seeks is in the control of the actual franchise employer, and PJI should not be required to produce information about the Franchise Defendants' employees. (Butler Decl. at ¶ 30.)

## CONCLUSION

For the foregoing reasons, this Court should deny Plaintiff's motion for court-authorized notice pursuant to section 216(b) of the FLSA in its entirety or, in the alternative, direct the parties to meet and confer to devise a mutually acceptable notice, or grant such other relief as the Court deems appropriate.

**DATED: October 22, 2018**              Respectfully submitted,

                                          PAPA JOHN'S INTERNATIONAL, INC.


                                          By:/s/ Gerald L. Maatman, Jr.
                                              *One of The Attorneys for Defendant*
                                              *Papa John's International, Inc.*

Gerald L. Maatman, Jr. (admitted *pro hac vice*)
SEYFARTH SHAW LLP
620 Eighth Avenue
New York, New York 10018
Telephone: (212) 218-5500
Facsimile: (212) 218-5526
gmaatman@seyfarth.com

Matthew J. Gagnon (*pro hac vice forthcoming*)
Christina M. Janice
Michael L. DeMarino (admitted *pro hac vice*)
SEYFARTH SHAW LLP
233 S. Wacker Drive, Suite 8000
Chicago, IL 60606-6448
Telephone: (312) 460-5000
Facsimile: (312) 460-7000
tahlering@seyfarth.com

21

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 22nd day of October, 2018, I electronically filed the

foregoing document with the Clerk of Court by using the CM/ECF system, which will send a

notice of electronic filing to all counsel of record, including the following:

> Andrew Biller
> Andrew P Kimble
> Markovits, Stock & DeMarco, LLC
> 4200 Regent Street, Suite 200
> Columbus, OH 43219
> Telephone: 614-604-8759
> Fax: 614-583-8107
> Email: abiller@msdlegal.com
> Email: akimble@msdlegal.com
>
> Brian Patrick O'Connor
> Santen & Hughes
> 600 Vine St.
> Ste. 2700
> Cincinnati, OH 452052
> 513-721-4450
> Fax: 513-721-0109
> Email: bpo@santen-hughes.com

/s/ Gerald L. Maatman, Jr.
Gerald L. Maatman, Jr.
